Sharon E. Ross RIDER, Appellant,

v.

Kenneth L. RIDER, Appellee.

No. 09–93–072 CV.

Court of Appeals of Texas,
Beaumont.

Submitted June 8, 1994.

Decided Nov. 17, 1994.

Larry Thorne, Beaumont, for appellant.

Rod J. Paasch, Nederland, for appellee.

Before WALKER, C.J., and
BROOKSHIRE and BURGESS, JJ.

## OPINION

BROOKSHIRE, Justice.

An appeal is brought in a divorce action which was tried to the 279th District Court with the consent of the parties. A jury was not employed. There were no children.

A decree of divorce, characterized as being a final decree, was signed by the trial judge and entered on December 9, 1992. The evidence was taken before the bench on two occasions before the decree was signed.

The parties were married on or about February 14, 1991. The parties ceased to live together as husband and wife on or about September 18, 1991, being the same calendar year. A temporary restraining order was signed on September 19th restraining the respondent, Sharon E. Ross Rider, from, inter alia, selling, transferring, assigning, mortgaging, encumbering, or in any other manner alienating any of the property of the petitioner or the respondent, whether the property be personal or realty, and whether the property be classified as separate or community. A temporary injunction was signed and promulgated containing specifically the same restraints and injunctions. Basically, only normal, usual, and reasonable living expenses could be incurred. No other indebtednesses were permitted under the temporary injunction.

The first significant hearing in the nature of a trial dealing with the merits was conducted on July 8, 1992. However, the evidence was reopened later and additional evidence was heard by the trial bench on November 17, 1992. At this November hearing the trial judge made certain findings and pronouncements from the bench, inter alia, the trial court found that the twenty-five acres in Mississippi, standing in the name of Sharon Rider, was acquired and that Mr.

Rider had paid certain separate funds in the amount of $2,000 or so on the twenty-five acres purchased. This twenty-five-acre tract was accumulated during the marriage and was located in the state of Mississippi. The court made certain findings concerning a prenuptial agreement.

The court further found that there was a balance of indebtedness against the dwelling and the approximately nine acres in Mississippi and that the parties themselves assumed one-half payment of the balance of the mortgage settlement between the parties concerning the said twenty-five acres in Mississippi. The court found that Mrs. Rider had taken that twenty-five acres as trustee for the parties and that she holds it as trustee.

After the November 17, 1992, trial, the court made certain awards and judgments. Firstly, the judgment was made in favor of appellee in the amount of $16,000 in cash payable to appellee for the following:

(a) $5,000 for attorney's fees awarded to the appellee and to be paid by the appellant;

(b) $11,000 was to reimburse the appellee for his separate property funds ($9,000 of which the appellant had wrongfully taken and spent, and finally to reimburse the appellee for his separate property monies being separate property purchase monies in the amount of $2,000 that he had paid on the note against the nine-acre tract. This nine-acre tract was owned by Mrs. Rider before the marriage.)

Secondly, the judgment was awarded to appellee for an additional $16,500—this additional $16,500 was to be paid to the appellee by the appellant as reimbursement for his payments and his personal liability on one-half of the $33,000 mortgage balance on the appellant's separate nine-acre tract of land—a property note which the appellee had cosigned. The trial bench also granted the appellee a purchase money lien for $16,500 on both of the tracts of land to secure the performance of Mrs. Rider's obligation. And the decree also refers to this particular lien as being an equitable lien. It is from this background as well as from a later hearing that this appeal is taken.

This finding was made pursuant to the fact that each of the parties had agreed to assume one-half payment of the balance of the mortgage. Mrs. Rider was specifically ordered to sign the necessary instruments, deeds of trust, and documents to comply with Mississippi land law. The amount was ascertained as the correct amount owed on the nine acres with the house, because apparently, the twenty-five acres had been taken in the name of Mrs. Rider alone and the twenty-five acres was later free and clear of indebtedness.

The court, after reciting the history of the transactions involving the Mississippi land, also ordered Mrs. Rider to assume a debt against the twenty-five acres of $26,500. The trial court at the July 1992 hearing also found that there was a sum of $2,000 applied to the purchase of the twenty-five acres of land. This $2,000 was definitely the separate property of Mr. Rider. There was an additional, approximate $8,000 that the court found was also the separate property and separate funds of Mr. Rider and the court granted to Mr. Rider reimbursement in the sum of approximately $10,000.

Over and above that $10,000 the court specifically announced that the sum recovered for Mr. Rider would be plus an additional $16,500 because Mr. Rider had financed certain land purchases and was obligated, indebted, and liable on certain promissory notes.

Mr. Rider had made substantial payments on a trailer where the parties had lived together. The trailer was looked upon by the trial court, we perceive, as a home or homestead and the court further announced that Mrs. Rider had taken to Louisiana about $4,000 worth of community property and Mr. Rider had received about $1,000 of community property.

Disregarding, however, the court's temporary orders and also the trial court's verbal orders, the appellant signed and attempted to make effective certain quitclaim deeds which attempted to purport to convey the two tracts or parcels of land in Mississippi, being the nine-acre tract and the twenty-five-acre joint venture tract to the appellant's

father. It is notable that Mr. Rider was going to be expected to pay half of an outstanding $33,000 debt and had personal liability in connection with said debt.

At a date set for trial, counsel for Mrs. Rider explained to the court that quite a number of pieces of correspondence had been sent to Mrs. Rider and the same were returned. Mrs. Rider's attorney announced to the court in the November trial that he had made numerous attempts to contact Mrs. Rider in regard to the November trial and to give her full notice of the November proceeding. He tendered copies of Respondent's 10, 11, 12, 13, 14, 15, and 16 which are copies of letters to Mrs. Rider and copies of certified mail envelopes showing that these matters were unclaimed by Mrs. Rider. Again, these pieces of correspondence were sent from Mrs. Rider's attorney to her and this announcement and tender was made by Mrs. Rider's attorney.

Mr. Rider testified that he had contacted an attorney in Liberty, Mississippi, a Mr. Toomey, to prepare the necessary papers that the Texas divorce court had ordered. Mrs. Rider was ordered to procure such documents; apparently she had failed. This was an attempt, obviously, to see that the papers were correctly drawn in accordance with the laws of Mississippi in regard to real estate. In fact, Mr. Rider had paid to Mr. Toomey, the Mississippi lawyer, a fee of $150. About the time these documents were prepared by the Mississippi lawyer, the record reveals that Mrs. Rider instead transferred the properties into her father's name. Therefore, Mrs. Rider notified Mr. Rider that she no longer owned anything so that Mr. Rider could not get anything out of her.

Certified copies of the quitclaim deeds were introduced into evidence, being from the State of Mississippi, County of Amite. The quitclaims were recorded in the office of Reece Nunnery, Chancery Clerk. These quitclaims were made to Charles William Ross, Mrs. Rider's father, and the grantor signed as Sharon E. Ross. She did not use her name of Rider. The record clearly reflects and the divorce chancellor below could have certainly considered and weighed the evidence to the effect that Mrs. Rider had transferred the properties into her father's name and then had told Mr. Rider that he, Mr. Rider, had no claim to it and he, Mr. Rider, could not make any claim to it and that he, Mr. Rider, wouldn't get anything out of it. Further, Mrs. Rider stated that no judge and no court and nobody in Texas was going to make her give up a "crying dime" because they had and have no venue. That testimony was admitted before the divorce chancellor without any objection.

Moreover, at this same hearing, the jurisdiction and the venue of the district court of Jefferson County, Texas, was clearly and unequivocally established. It was also clearly shown that the land involved—being the twenty-five acres—was landlocked and that it was adjoining the nine-acre tract and the only access to the twenty-five-acre tract would be across Mrs. Rider's original, separate nine-acre tract.

Therefore, as a practical matter, the record showed that to get to the twenty-five-acre tract Mr. Rider would have to have some access across the nine-acre tract. The Mississippi lawyer had advised that it was absolutely necessary to have a right-of-way across the nine-acre tract. Otherwise, the twenty-five-acre tract would be totally valueless to Mr. Rider.

The evidence at this November trial further showed that Mrs. Rider took possession of a Chevrolet automobile, being a valuable vehicle. It was her obligation under court order to pay the note. The note amounted to over $4,280 plus interest. She failed to pay the note and the note was accelerated. Mr. Rider was also primarily liable and responsible for that note to the First City Bank of Beaumont. The Beaumont bank was definitely holding Mr. Rider responsible and liable for the entirety of the monies due, both principal and interest, on the said note. The record reflects that Mrs. Rider had told Mr. Rider that concerning the attempt of the bank to repossess the Chevrolet, that she, Mrs. Rider, would prevent any repossession. Mrs. Rider stated she would hide the Chevrolet out in the woods someplace to keep the Chevrolet from being repossessed.

At the end of this November 1992 trial, the court carefully explained in detail again his orders and findings and also observed that if Mrs. Rider failed and refused to pay the note on the Chevrolet that he would amend the property division and assign the title to the Chevrolet to Mr. Rider with Mr. Rider paying the money due on the Chevrolet. During these hearings and from the evidence in the record before us, we fail to perceive that the bench in the divorce suit, sitting on the equity side of the court, did anything unjust or did something that was not right. It was proved by documentary evidence that Mrs. Rider was not cooperating with her own attorney and that she, on occasion, simply would not come to court. The record is glaringly clear that Mrs. Rider was not heeding the chancellor's directions and orders.

■ Not only do we conclude, we also hold, that the giving of the quitclaims to the father was a direct violation of the valid orders of the divorce court. The appellant, Mrs. Rider, presents and briefs and argues three points of error. They are:

Point of Error Number One: The trial court erred and abused its discretion in its division of the parties' marital estate.

Point of Error Number Two: The trial court erred and abused its discretion in awarding appellee an equitable lien against appellant's separate real property.

Point of Error Number Three: The trial court erred and abused its discretion in granting a money judgment in favor of appellee for reimbursement to his separate estate.

■ The record reflects that during the pendency of the divorce case, the appellant, Mrs. Rider, had cleaned out the mobile home and carried numerous possessions with her to Louisiana. Of the community property which remained in the mobile home the appellee received only about $946 more in value than the appellant received. We conclude that this amount does not create an abuse of discretion.

There was a lengthy hearing on a motion for new trial and the appellant attended the court and testified. At the hearing on the motion for new trial the appellant testified that she had about $16,000 in equity in the twenty-five-acre joint venture tract which she stated was in her name only and was, at that time, debt-free and that she owed only $33,000 on her separate property nine-acre tract which was worth about $75,000 including the value of the dwelling structure thereon, giving her an additional equity of $42,000 in addition to the $16,000, making $58,000 of assets owned by Mrs. Rider.

The record is devoid of any realistic values of any separate property then owned by the appellee, Mr. Rider. At this time of the proceeding (subject to the attempted quit-claims), the title to both pieces of Mississippi property were in the appellant's name only, although both parties remain liable for the debt on the nine acres. The twenty-five acres was free and clear of debt and the sole record owner therein was the appellant Sharon Ross.

■ Under these facts, as well as others, there was no abuse of discretion in the division of the marital property. Considering all the factors involved, we determine that the trial court divided the property in a manner that was just and right. The trial court is empowered with wide discretion in making a division that is just and right. *Baker v. Baker*, 624 S.W.2d 796 (Tex.Civ. App.—Houston [14th Dist.] 1981, no writ). Point of error number one is overruled.

■ The trial bench acted properly and within its discretion in awarding to the appellee a $16,500 purchase money lien against the appellant's separate real property. The twenty-five-acre tract was purchased before the parties married. They had been living together. The deed was made out only in the name of the appellant but the appellee co-signed the note and remained fully liable for the debt. Later, the appellant's separate property nine-acre tract of land was mortgaged and the twenty-five-acre tract of land was then paid off in full and debt-free, the twenty-five-acre tract of land having been paid off with the mortgage loan money. The nine-acre tract itself remained in appellant's name only. The parties understood that the twenty-five-acre tract was a joint venture tract of land and the parties made payments

on the notes together. At a time after the parties were legally and ceremonially married, the appellee spent $2,000 of his own separate property money to make an additional payment on the nine-acre tract note. The appellee remained liable as a co-signer. During the time that they were paying the note together they paid about $12,500 on the note. Yet, in spite of this record and in spite of the separate monies paid by the appellee, he did not have a legal title or a record title to either tract of land—neither tract stood in his name.

■ As we read and comprehend the appellant's brief, the appellant makes no attack upon the imposition of an equitable lien or of a purchase money lien on the twenty-five acres. The only attack is made against the lien on the nine-acre tract. But the facts of the case show that the lien was actually a purchase money lien. We determine that decisive precedents authorize the placing and imposition of a lien against a spouse's separate property for purchase money. *See Mea v. Mea,* 464 S.W.2d 201 (Tex.Civ.App.—Tyler 1971, no writ). Clearly, the placing or the imposition of an equitable lien as well as a purchase money lien on one spouse's separate properties is correct in order to secure a payment of a money judgment as part of the other party's interest in the total property of the parties. This is a permissible tool to see that the judgment is properly carried out and that the judgment becomes in practicality both just and right. *See and compare Jones v. Jones,* 804 S.W.2d 623 (Tex.App.—Texarkana 1991, no writ).

The trial court, after a proper hearing, determined that there was still a note owed upon which Mr. Rider was responsible and liable for around $30,000 or more. The court also observed that Mrs. Rider was attempting to defraud the trial court by giving quitclaim deeds. And the trial chancellor ruled that under the law governing quitclaim deeds that actually Mr. Rider still had an interest in the lands and he had an interest in same by reason of purchase money.

The case of *Heggen v. Pemelton,* 836 S.W.2d 145 (Tex.1992) acknowledges that the creation of a lien for purchase money is a recognized lien on separate lands. The Court cited TEX. CONST. Art. XVI, § 50 and TEX.PROP.CODE ANN. § 41.002. The opinion states in substance that when dividing marital property upon a divorce, the trial courts have the power to impose equitable liens on one spouse's separate real property in order to secure the other spouse's right of reimbursement in certain limited situations.

Justice Gonzalez wrote:

[I]t imposed a lien on Ms. Heggen's homestead that, based on the record, did not fit into any of the categories allowed by the Texas Constitution; that is, it was not a tax lien, it was not a purchase money lien, nor was it an improvement lien for which the "work and material [had been] contracted for in writing, with the consent of both spouses." TEX. CONST. art. XVI, § 50.

Justice Gonzalez was correctly interpreting and applying the Texas Constitution to Heggen's separate property homestead and her "homestead interests". This is simply not our case.

■ *Heggen involved a wife's separate property homestead, being a Texas homestead.* Our record is distinctly different and easily distinguishable. The nine acres were Mississippi land. Sharon lived in Nederland, Jefferson County, Texas. She had no "homestead interests" created and protected by the Texas Constitution in the Mississippi nine acres. Justice Gonzalez in a very well-reasoned and well-written opinion declared that the attempted lien on Ms. Heggen's separate property homestead did not fit into any of the categories allowed by the Texas Constitution.

It is glaringly clear and unassailable that the Texas Constitution, revered as it is, does not govern Mississippi land. Again, Sharon had no "homestead rights" involved either under Texas or Mississippi law. Sharon had deeded away her interests in the nine acres. Clearly she had no "homestead interests" necessary to the holding and rationale of *Heggen.*

Under this record, Mr. Rider had valid, substantial reimbursement rights. It is noteworthy also to observe that the twenty-five-acre tract was not a homestead of Mrs. Rider. We overrule point of error number two.

Concerning point of error number three, we note that the trial court's final decree of divorce awarded to appellee a money judgment in the amount of $16,000. The court recited in its final decree of divorce that this $16,000 was for attorney's fees, for community property rights to the appellee, and for the appellee-petitioner's separate property with which the appellant absconded.

There were no findings of fact nor conclusions of law filed; none were requested.

 Appellant concedes to the taking of $9,000 from the parties' joint accounts when she separated from the appellee in September of 1991. The trial chancellor was well within his prerogatives to find that this $9,000 was correctly traced to appellee's separate property funds and separate property rights. Basically, the right of reimbursement is recognized as an equitable right arising upon the dissolution of a marriage through divorce, as here. Reimbursement is realistically a claim for the return of funds and monies. Reimbursement is a matter that is discretionary with the trial court. *See Vallone v. Vallone*, 644 S.W.2d 455 (Tex. 1982). The right of reimbursement is in equity. A mathematical certainty for its determination is not required.

Although the appellant argues that the $9,000 was spent on ordinary living expenses, it is obvious that the trial bench had grave trouble concerning the credibility of appellant. The trial chancellor was the sole judge of the facts and the credibility of the witnesses. In fact, as noted above, the chancellor concluded that the appellant, Mrs. Rider, had attempted to defraud the trial court.

During the pendency of the divorce the record reflects, and the trial chancellor could have considered properly, the testimony and the evidence that the appellant drew unemployment compensation part of the time and also worked part of the time. During this pendency she paid about $6,300 on the debt on the nine-acre tract. This $6,300 certainly does not qualify as ordinary living expenses. Appellant's point of error number three is not sustainable; the same is overruled.

We affirm the judgment of the court below, observing that the trial bench could have considered that there were important discrepancies and inconsistencies in the appellant's testimony from time to time. The trial bench could observe her general attitude in court and her actions, her demeanor, the tenor of her voice, and could thereby pass upon her credibility. We cannot. Documentary evidence proved that appellant thwarted the divorce court's jurisdiction and hindered the chancellor's ability to pragmatically and practically divide the properties in a manner that was just and right. The trial chancellor flat out observed that the appellant was attempting to defraud the divorce court. But the chancellor dealt justly, fairly, and rightly with the appellant.

A hearing took place February 16, 1993. The hearing was on a motion for new trial filed by Sharon, the wife. Over strenuous objections the trial judge permitted the wife and her attorney of record to amend at the last minute the motion for new trial to bring in and present to the bench new evidence and new documents. The bench, showing patience and forbearance, permitted the amendment to the motion for new trial. Mrs. Sharon Ross Rider took the stand. She wanted to retry the property division although she had absented herself either with just cause and reason or without the same from a certain important prior hearing and trial that dealt with the division of the marital estate. She was asked by her own lawyer:

Q Now, in a subsequent hearing Mr. Rider was awarded also the vehicle along with the debt; is that correct?

A I have no idea what went on during that hearing.

Q The value of the—would you say the value of the community property that was awarded you was only a thousand dollars?

A That was awarded to me?

Q Yes.

A It wouldn't have amounted to $20.00.

She maintained that everything else that she was awarded was her sole and separate property. Ms. Rider did acknowledge that the note in the approximate amount of $32,000 which was secured by certain lands had been

paid off and the note did not exist at the time of the motion for new trial hearing.

Upon cross-examination Mrs. Rider acknowledged that she had not been at the last hearing that was a full and adequate hearing on questions involving the separate property of the parties and the marital estate of the parties. She denied that she had refused to accept mail from her own attorney, although at a previous hearing we think it is a fair, balanced, and correct statement to say that her own attorney had offered and placed into the record very strong evidence to the effect that she would not accept registered or certified mail to her from her attorney. She did acknowledge, however, that considerably after the fact she was in receipt of a copy of the final decree of divorce. She was asked about the car that had been a heated, hostile issue and a contentious one. We find in the record:

Q Where is the car, the 1988 Beretta?

A Mr. Rider has it.

Q When did you give it to him?

A I didn't give it to him. He stole it.

Although Mr. Rider had undertaken to pay off the contract debt on the automobile, Mrs. Rider said that Mr. Rider had no right to take possession of the car. She admitted, however, that she put a club on it:

A ... That's all that kept them from stealing it. The club was put on it because he had stolen the car from me before, and I had to get the police to get it back. So, after that, after—

Q When was the car taken?

A Several weeks after that incident.

Q Do you know what day it was?

A I don't—I'm sure that I've got it written down somewhere, but it was several weeks—

Q Did you report it to the police?

A I had no reason to report it. I knew who had it.

Q You didn't make a police report?

A Why would I?

Q Well, if the car was stolen, wouldn't you make a report to the police?

A Not when you know who has it.

She finally admitted that she had not come to the previous hearing on the questions and issues concerning the property rights of the parties. She did state, however, that she was working hard to keep a $6.00 an hour job and she simply could not afford to come to the court hearing. She did acknowledge that at the July 8, 1992, hearing her father was present in court and her father heard the court's orders concerning the disposition (or rather, the non-disposition) of the properties. She denied that she understood that she had been ordered by the judge to sign certain papers granting Mr. Rider a claim on the land in Mississippi but she disagreed with these orders although she admitted that she discussed the same with her attorney at some length.

Eventually Mrs. Rider at least partially agreed that she in part understood what the judge had done and had said concerning the land but she simply didn't understand why and she did not see any documentation. Under cross-examination she did advise the trial bench that she had talked to her own attorney and that she had attained an understanding that because Kenneth Rider's name was on the notes and that he was responsible to pay that note that in order to provide that he not be held responsible for it (without any remedy) that a lien was to ensure that Mr. Rider would not have to pay the note and that was Mrs. Rider's understanding.

Even with this understanding she, nevertheless, quitclaimed two pieces of Mississippi land to her father. She adamantly claimed that they were her separate property and were not subject to the divorce court proceeding. She finally, towards the last of the cross-examination, stated in substance that she understood in the beginning that "neither of us were supposed to move or transfer properties". She admitted also that after the quitclaims were put into her father's name that her father, Charles William Ross, had gone to Trustmark National Bank in Liberty, Mississippi, and had borrowed money on the land.

She stated that her father took it all over because she (Mrs. Rider) was going to lose it all. She finally agreed that the nine-acre tract with the improvements was worth about

$75,000 or perhaps a little more and that the other tract, being a twenty-five-acre tract, was worth something in excess of $16,000 which had been its purchase price. She acquiesced in the proposition that the two pieces of real estate with improvements were reasonably valued at $90,000. There was only about $30,000 or $32,000 owed on the same. She thus possessed a sizeable equity.

Although, of course, the record before us is not as revealing and discernible as the live witness' acts and demeanor and tenor of her voice were before the trial judge, we, nevertheless, can glean from the nature of the answers made by Mrs. Rider that the trial bench could reasonably have some reservations concerning her evidence given at the hearing on the motion for new trial. The trial divorce chancellor, sitting in equity, was in a much superior position to weigh Mrs. Rider's credibility.

After a full hearing and after hearing all the witnesses proffered to the trial bench, the motion for new trial was denied. No error was demonstrated in the denial of the motion for new trial. Among other salient testimony, Mr. Rider without equivocation stated that he did not have the automobile in question, he did not steal the same, the last time he had seen or had possession of the automobile was about October 1st of 1991. On this line of questioning there was no cross-examination whatsoever by Mrs. Rider's attorney. After hearing further argument and summations by the respective counsel, the court again announced "New trial denied".

It is noteworthy that Kenneth Rider definitely invested substantial separate monies into the purchase price of the twenty-five-acre tract. These separate monies were part and parcel of a joint endeavor to acquire the twenty-five-acre tract. Sharon agreed to this arrangement and encouraged the same; she participated in this arrangement.

*The dissent places its entire ruling upon Heggen v. Pemelton, supra.* The dissent points out that a court may not impose equitable liens on one spouse's separate real property unless that the equitable lien secures a right of reimbursement for community improvements made to the property, citing *Heggen,* but the land is situated in the state of Mississippi. Also, *Heggen* is different and distinguishable on basic, operative facts. Sharon has not proved up the law of Mississippi.

Again, Kenneth's separate monies were not community monies. The dissent acknowledges that both the Riders wanted to purchase a twenty-five-acre tract adjacent to the nine-acre tract and Sharon Rider agreed to use the nine-acre tract as collateral. Clearly, the twenty-five-acre tract was acquired by purchase and not by any other manner. Therefore, logically the separate monies of Kenneth and the collateralizing of the nine-acre tract were in reality purchase money, purchase assets, and purchase collateral.

Sharon has not shown what is meant by separate property under Mississippi land law but what the record clearly and plainly shows is that Sharon, in direct violation of a court order, conveyed the nine-acre tract to her father, Charles William Ross. Her father forthwith mortgaged it to a Mississippi bank. The nine-acre tract was not Sharon's homestead; she lived in Nederland, Texas, and later removed to Louisiana. The record fails to show even living in Mississippi by Sharon.

Significantly, her father, Charles Ross, was at the hearing and actually heard the divorce chancellor below order that the nine-acre tract as well as the twenty-five-acre tract were part of the property to be restrained from "selling, transferring, assigning, mortgaging, encumbering, or in any other manner alienating any of the property" in any way.

Sharon sought relief and recoveries from the Texas court, but it must be remembered that Sharon said more than once that no Texas court was going to tell her what to do—especially with the assets she *asserted* a claim of sorts to.

The record clearly reveals this, even though she was asking for relief and adjudication of her alleged rights before the Texas court. Her father heard and understood the court's orders and knew of them. Sharon was ordered not to convey the nine acres, knowing such a conveyance would be in flagrant violation of the orders of the Texas

court. But Sharon deeded the nine acres to her father.

Sharon has failed to show that Mississippi law forbids the imposition of an equitable lien upon "one spouse's separate real property" unless the equitable lien necessarily secures the right of reimbursement for community improvements. Thus, Sharon has failed to demonstrate that the Texas chancellor's judgment, even under Mississippi land law, was erroneous.

*Heggen v. Pemelton, supra,* does not govern Mississippi land law since unquestionably the law of the State in which the land is situated governs. At the very least, Kenneth's separate monies were purchase monies and the collateralizing of the nine-acre tract was merged into Kenneth's separate monies creating a purchase asset for the twenty-five acres.

Said emphatically by this writer, Sharon's attorney is not to be criticized but, indeed, to be complimented on his professional efforts on Sharon's behalf. Sharon, the record glaringly proves, failed to cooperate with him and, indeed, thwarted his excellent, professional efforts.

As noted above, the trial chancellor observed and stated in this nonjury proceeding that the appellant, Mrs. Rider, was attempting to defraud the divorce court. Apparently, in the very last analysis, Mrs. Rider did, in major part, thwart the divorce court's orders. Mrs. Rider filed under Chapter 7 of the Bankruptcy law in the United States Bankruptcy Court for the Middle District of Louisiana. Generally, Chapter 7 Bankruptcy proceeding is a liquidating one; it is not a reorganization. Following and pursuant to a Stay Order, our Ninth Court abated this appeal. However, by the granting of a special, proper motion, Judge Louis M. Phillips, United States Bankruptcy Judge for the Middle District of Louisiana, signed and entered an appropriate order granting Kenneth L. Rider relief from the automatic bankruptcy stay so that our Ninth Court of Appeals could continue with this appeal. Judge Phillips' enabling order was signed on January 12, 1994. A true copy of the said order in the Chapter 7 cause of Sharon Ross Rider, Debtor, is properly in the record before us.

The bankruptcy judge found that good cause existed for lifting the Stay Order. The bankruptcy judge then ordered that Kenneth L. Rider be granted his requested relief from the automatic Stay Order.

We pass upon and decide this appeal of Sharon and Kenneth Rider based solely on the record before us. Query: Will the bankruptcy judge now discharge Sharon Rider of her debts, including those she legally owes to Kenneth which were certainly judicially determined and declared in the Texas divorce court?

The judgment and final decree of divorce of the trial court is hereby affirmed in its entirety.

AFFIRMED.

BURGESS, Justice, dissenting.

I respectfully dissent. It is undisputed the trial court awarded Kenneth Rider a lien on Sharon Rider's separate property, the nine acre tract. A court may not impose equitable liens on one spouse's separate real property unless it secures a right of reimbursement for community improvements made to the property. *Heggen v. Pemelton,* 836 S.W.2d 145 (Tex.1992). There is *no evidence* of any such improvements. The nine acre tract belonged to Mrs. Rider prior to the marriage. The Riders wanted to purchase a twenty-five acre tract adjacent to the nine acre tract and used the nine acre tract as collateral. The majority treats this mortgage transaction as a purchase, thus allowing a purchase money lien. Clearly it was not a purchase, thus no legal basis exists for the equitable lien against the nine acre tract. I would reform the judgment by deleting any reference to a lien against the nine acre tract and affirm the judgment as reformed. Unfortunately, being in the minority, I cannot do so, but can only dissent.